NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3499
_____

STEPHEN SCHLEIG

v.

BOROUGH OF NAZARETH; THOMAS M. TRACHTA, IN HIS INDIVIDUAL AND
OFFICIAL CAPACITY; MAYOR FRED C. DAUGHTERY, JR., AND;
MAYOR CARL R. STRYE, JR., IN THEIR INDIVIDUAL AND OFFICIAL
CAPACITIES; DANIEL JAMES TROXELL, IN HIS INDIVIDUAL AND OFFICIAL
CAPACITY; RANDALL MILLER, IN HIS INDIVIDUAL AND OFFICIAL
CAPACITY; PAUL KOKOLUS, JR., IN HIS INDIVIDUAL AND OFFICIAL
CAPACITY; LARRY STOUDT; FRANK MAUREK; MICHAEL KOPACH;
CYNTHIA WERNER; CHARLES DONELLO; DANIEL CHIAVAROLI;
WILLIAM MATZ; BRIAN F. REGN; JOHN N. SAMUS; LANCE E. COLONDO;
CHRISTIAN AUDENRIED; CARL FISCHL, IN HIS INDIVIDUAL AND
OFFICIAL CAPACITY

Daniel James Troxell,
Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-15-cv-04550)
District Judge: Hon. Jeffrey L. Schmehl
_____

Submitted Under Third Circuit LAR 34.1(a)
June 15, 2017

Before: JORDAN, KRAUSE, and GREENBERG, *Circuit Judges.*

(Filed: June 15, 2017)

_____

_____

JORDAN, *Circuit Judge*.

This appeal is brought by a police officer, Daniel James Troxell, who was employed by the Police Department of the Borough of Nazareth, Pennsylvania. A fellow officer, Stephen Schleig, accused Troxell of threatening him with termination, physical violence, and even death, in retaliation for Schleig's active involvement in a police union. Troxell moved to dismiss Schleig's complaint on the basis of qualified immunity, and that motion was denied by the District Court.

On appeal, Troxell argues that his conduct does not constitute retaliation and that, even if it did, the law did not clearly establish that his conduct was improper. Because the District Court correctly determined that Troxell's claim of qualified immunity could not prevail at a preliminary stage of the case, we will affirm.

I.    FACTS[1]

Schleig was employed as an officer with the Nazareth Borough Police Department. **[App. at 22.]** In 2009, he became involved in the local police union and

---

This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

[1] In reviewing the District Court's rejection of Troxell's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we "are required to accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the non-moving party" – in this case Schleig. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (internal quotation omitted).

2

participated in union advocacy by filing grievances and reporting on purportedly unfair labor practices in the police department. **[App. at 23.]** In part because of his union activities, Schleig was heavily criticized by Chief of Police Thomas M. Trachta and other Borough officials and police officers. **[App. at 24-28.]** Trachta in particular retaliated against Schleig by publicly berating him, questioning his mental health, reassigning him to less desirable shifts, and giving him undesirable tasks. **[App. at 25, 28, 31.]**

Tensions in the Police Department further intensified when another officer, Frederick J. Lahovski, Jr., who was also active in the labor union, brought a lawsuit against the Police Department alleging violations of constitutional rights. **[App. at 32.]** Trachta and other officers, including Troxell, suspected that Schleig was assisting Lahovski with his lawsuit by providing him with copies of incident reports and other documents. **[App. at 32.]**

In November 2013, animosity within the department increased when Troxell confronted Schleig. **[App. at 32.]** According to Schleig's Complaint,

> Troxell stated … that he suspected another police officer was assisting Lahovski with his case by providing Lahovski with copies of incident reports involving … Troxell, and … Troxell intended to harm that individual once he learned his identity. Specifically, … Troxell indicated to [Schleig] that he intended to get the individual fired, file criminal charges against the individual for alleged theft, and further go after the individual physically and cause them [sic] severe harm as well as severe harm to the individual's family. … Troxell proceeded to threaten [Schleig] and any individual found to be supporting Lahovski by stating that he [i.e., Troxell] and … Trachta were going to end the alleged culprit's life. … Troxell made very clear to [Schleig] that he was very serious and was in no way exaggerating or joking.

3

(App. at 32-33.) As the verbal abuse proceeded, Troxell revealed that he and Trachta had a plan to spy on those suspected of being sympathetic to Lahovski, including Schleig. **[App. at 33.]** Troxell specifically questioned whether Schleig had given Lahovski a copy of Troxell's resume. **[App. at 33.]** Troxell then

> indicated that [the Borough of Nazareth] … Trachta … and [the Borough Council] were working on going after [Schleig] because they suspected that [Schleig] was assisting Lahovski with his lawsuit … . Troxell continued by telling [Schleig] that … Trachta had evidence that was going to cause [Schleig] to lose his job and get arrested because he was suspected of being the "spy for the union."

(App. at 33.)

The harassing conduct from Trachta and other officers and Borough officials continued until Schleig brought the present lawsuit. **[App. at 35-40.]** Schleig sued the Borough of Nazareth, its present and former Mayors and the Borough Council, Trachta, Troxell, and other Police Department officers (collectively the "Defendants") pursuant to 42 U.S.C. § 1983. **[App. at 16-21.]** He alleged that the Defendants conspired to violate and violated his First Amendment rights of free speech, free association, and the ability to petition for redress of grievances. **[App. at 41-51.]** He also argued that the Defendants conspired to violate and violated his rights to substantive and procedural due process and equal protection under the Fourteenth Amendment. **[App. at 51-53.]**

After the Defendants filed a motion to dismiss, Schleig filed an Amended Complaint. **[App. at 4, 16]** The Defendants then submitted a motion to dismiss the Amended Complaint, which the District Court granted in part. **[App. at 4.]** The Court dismissed with prejudice the claims against some of the Defendants, including the former

4

Mayor and other members of the Borough Council, and it also dismissed the Fourteenth Amendment and conspiracy claims against all Defendants. **[App. at 1-2.]** It refused, however, to dismiss Schleig's First Amendment retaliation claims against Troxell and some of the other Defendants, **[App. at 4.]** and it denied Troxell's motion to dismiss on the basis of qualified immunity. **[App. at 9.]** The Court concluded that "[Schleig's] Amended Complaint is sufficient to plead a claim for retaliation," (App. at 9), and that Troxell's qualified immunity defense failed because "[i]t is clearly established that a public employee has the constitutional right to speak as a citizen on matters of public concern without fear of retaliation." (App. at 10 (citing *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 987 (3d Cir. 2014)).) Troxell then brought this timely appeal challenging the District Court's refusal to grant him qualified immunity.

## II. DISCUSSION[2]

Qualified immunity protects government actors from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Our analysis of qualified immunity proceeds in two parts, which may be tackled in either

[2] The District Court had jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). We have jurisdiction pursuant to 28 U.S.C. § 1291. "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291[.]" *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). In this case, we have jurisdiction because the question at issue is "whether the law allegedly violated was clearly established at the time of the defendant's actions … the type of legal issue immediately appealable as a final decision." *Zaloga v. Borough of Moosic*, 841 F.3d 170, 174 n.3 (3d Cir. 2016) (internal quotation marks omitted). We exercise plenary review over the District Court's denial of the motion to dismiss. *Acierno v. Cloutier*, 40 F.3d 597, 609 (3d Cir. 1994).

5

order based on our "sound discretion." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). First, we consider "whether the alleged facts, taken in the light most favorable to the injured party, 'show [that] the [government official]'s conduct violated a constitutional right[.]'" *Zaloga v. Borough of Moosic*, 841 F.3d 170, 174 (3d Cir. 2016) (first and second alterations in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, we "ask whether the right was clearly established 'in light of the specific context of the case, [and] not as a broad general proposition.'" *Id.* (alteration in original) (quoting *Saucier*, 533 U.S. at 201).

On appeal, Troxell argues that the District Court erred when it concluded that his remarks could constitute unconstitutional threats of retaliation. He also argues that, even if he threatened Schleig, his actions did not violate clearly established law. But based on the detailed allegations of the Amended Complaint – allegations that we are bound to accept as true at this stage of the proceedings – Troxell's threats against Schleig constitute textbook retaliatory speech, and "every reasonable official" in Troxell's shoes "would have understood that what he [was] doing violate[d]" Schleig's right against retaliation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

A.     *Schleig Made a Valid Claim of First Amendment Retaliation*

As a general principle, it is well established that "public employees do not surrender all of their First Amendment rights by reason of their employment" and may "speak[] as citizens about matters of public concern," without retaliation or punishment. *Dougherty*, 772 F.3d at 987 (quoting *Garcetti v Ceballos*, 547 U.S. 410, 417 (2006)).

6

Speech that is critical of unlawful labor practices qualifies as speech on matters of public concern, *see Davignon v. Hodgson*, 524 F.3d 91, 102 (1st Cir. 2008) (explaining that, when labor speech is intended "to publicly express criticism of management," that fact "weigh[s] heavily" in finding that the speech involved a matter of public concern); *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999) (holding that "activities on behalf of a union faction that necessarily entail a substantial criticism of management raise matters of public concern"), so long as it addresses "fundamental problems" reaching beyond the employee's "day-to-day minutiae," *Watters v. City of Phila.*, 55 F.3d 886, 894 (3d Cir. 1995), and does not solely discuss "mundane employment grievances," *Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 467 (3d Cir. 2015). The publicly-minded critic is thus entitled to be free of retaliation.

"To prevail on a retaliation claim, a plaintiff must prove '(1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation.'" *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) (quoting *Eichenlaub v. Twp. of Indiana,* 385 F.3d 274, 282 (3d Cir. 2004)). Only the second element is at issue in this appeal.[3]

---

[3] The parties do not, at this time, dispute that Schleig was engaged in a constitutionally-protected activity with his pro-union speech. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968) (explaining that First Amendment speech protections only apply to government employees speaking out on matters of public concern); *Hotel & Rest. Emps. & Bartenders Int'l Union Local 54 v. Read*, 832 F.2d 263, 265 (3d Cir. 1987) (noting that "some union activity presumably comes within the right to associate for expressive purposes"). Nor is there any dispute, at this time, with regard to causation.

The parties disagree as to whether Troxell's remarks constitute an unlawful threat of retaliation. Schleig alleges that Troxell threatened to get him fired as a result of Schleig's continued union activities. "[T]he threat of dismissal from public employment is … a potent means of inhibiting speech." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968). Therefore, the threat of dismissal, depending on its clarity and credibility, can form the basis for a claim of retaliation in violation of the First Amendment. *See id.* (noting that the "exercise of [the] right to speak on issues of public importance may not furnish the basis for … dismissal from public employment").

But threatening a loss of livelihood is relatively small stuff here. According to Schleig, Troxell threatened to kill him. **[App. at 32.]** In the few cases in which government officials have made death threats in response to constitutionally protected activity, no one has tried to claim that the offending official's behavior is something other than unlawful retaliation. Even the strained defenses in those cases have evidently not tried to stretch that far. *Cf. Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013) (concluding that "a reasonable jury could find that threats of death, issued by a correctional officer tasked with guarding a prisoner's segregated cell, would chill a prisoner of ordinary firmness from engaging in the prison grievance process"); *Van Deelen v. Johnson*, 497 F.3d 1151, 1157 (10th Cir. 2007) (holding that "allegations of physical and verbal intimidation, including a threat by a deputy sheriff to shoot him if he brought any more tax appeals, would surely suffice under our precedents to chill a person of ordinary firmness from continuing to seek redress for (allegedly) unfair property tax assessments"). We have found no precedent that puts in doubt the unlawful retaliatory

8

character of Troxell's conduct as alleged in the Amended Complaint, and, indeed, it is obvious. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. ... [I]n the light of pre-existing law the unlawfulness [of the government official's conduct] must be apparent.'" (quoting *Anderson*, 483 U.S. at 640)).

To find some cover, Troxell argues that he did not threaten Schleig with retaliation because his remarks were not actually directed at Schleig. **[Opening Br. at 24.]** He claims that, at the time, he "did not know that [Schleig] was the individual about whom he was speaking" and therefore he "could not have formed the specific intent necessary to retaliate." (Opening Br. at 24). But Troxell's recitation of the facts is inconsistent with the allegations in Schleig's Complaint. Schleig alleges that Troxell directly threatened him with termination, in terms of both employment and existence, because of pro-union activities. **[App. at 32-33.]** While Troxell began his conversation with Schleig by threatening an unnamed informant, he quickly made clear that he and the other Defendants "were working on going after [Schleig] because they suspected that [Schleig] was assisting Lahovski with his lawsuit against Defendants for violations of his constitutional rights." (App. at 33.) Accepting Schleig's account of the facts, again as we must, Troxell clearly directed his threats of retaliation at Schleig in a manner that a jury could find violated Schleig's constitutional rights.

  B. *Schleig's Actions Violate Clearly Established Law*

9

Troxell next argues that, even if we conclude that he unlawfully threatened Schleig, we should nevertheless conclude that his actions did not violate clearly established law.  **[Opening Br. at 22.]**  This is a position that barely warrants a response. Thirty years ago, in a case involving retaliation against a police officer no less, we held that "retaliatory discharges" were "clearly established" as unlawful.  *Bennis v. Gable*, 823 F.2d 723, 733 (3d Cir. 1987).  And, as already discussed, it should go without saying that no reasonable officer could think that it was lawful to threaten to injure or kill an employee because of that employee's participation in a labor union.

Troxell asserts, however, that words that merely threaten without subsequent concrete action, are not clearly established as a violation of the First Amendment's protection against retaliation.  **[Opening Br. at 25.]**  In advancing that proposition, Troxell relies on an erroneous interpretation of our recent decision in *Zaloga v. Borough of Moosic*, taking language from the opinion out of context.  (*See* Opening Br. at 25 (*quoting Zaloga*, 841 F.3d at 176 ("[O]ur cases do not provide government officials with clear guidance as to when a government official's own speech can nevertheless constitute unconstitutional retaliation."))).  In that case, an individual brought suit against a politician who, in retaliation for political criticism, urged other government officials not to renew a contract with the individual's business.  *Zaloga*, 841 F.3d at 172-73. However, the politician in that case did not have the power to take adverse action himself and did not do anything more than suggest to other officials that they should not contract with that individual.  *Id.* at 173.  We explained that when a public official retaliates merely by speaking out critically, "the official's 'own First Amendment speech rights are

10

implicated.'" *Id.* at 176 (quoting *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir.

2001)). [4] Therefore, "[i]t is not enough that defendant speaks critically of plaintiff or

even that defendant directly urges or influences the third party to take adverse action.

Rather, defendant must 'threaten' or 'coerce' the third party to act." *Id.* (quoting

*McLaughlin*, 271 F.3d at 573). "[I]n the absence of a threat, coercion, or intimidation,

intimating that punishment, sanction, or adverse regulatory action will follow, such

speech does not adversely affect a citizen's First Amendment rights even if defamatory."

*McLaughlin*, 271 F.3d at 573 (citation omitted).

*Zaloga* plainly does not stand for the proposition that an official is free to threaten

to terminate or physically harm an employee because the official is speaking his mind. In

contrast to the defendant in *Zaloga*, Troxell did not simply criticize Schleig or suggest to

others that Schleig should be punished for his activities. Instead, Troxell "intimat[ed]

that punishment, sanction, or adverse … action" would follow as a direct result of

Schleig's union activities. *Id.* (citation omitted). In particular, he made it clear that he

and the other Defendants "were working on going after [Schleig] because they suspected

that [Schleig] was assisting Lahovski with his lawsuit against Defendants for violations

of [Lahovski's] constitutional rights[,]" (App. at 33) and he let Schleig know that "severe

---

[4] *McLaughlin v. Watson*, another case relied upon by Troxell, is also easily distinguishable. 271 F.3d 566 (3d Cir. 2001). In *McLaughlin*, a U.S. Attorney for the Eastern District of Pennsylvania was sued for advocating that agents of the Pennsylvania Attorney General's Office be fired. *Id.* at 568. Critical to our decision that the U.S. Attorney was entitled to qualified immunity was the fact that a U.S. Attorney had no authority to threaten or coerce a state officer and therefore his suggestion of retaliation was mere speech. *Id.* at 573-74. Here, in contrast, Troxell threatened to take direct retaliatory action against Schleig.

11

harm" or death would follow. (App. at 32.) Such direct threats of adverse action are squarely prohibited by Supreme Court precedent and the precedent of this Court. Therefore, Troxell is not entitled to qualified immunity at this stage. Whether a jury will believe Schleig's allegations and any associated proof is yet to be seen.

## III.  CONCLUSION

For the foregoing reasons, we will affirm.